[No. E029320. Fourth Dist., Div. Two. Oct. 30, 2001.]

In re WALLACE REED PHELPS on Habeas Corpus.

452

**COUNSEL**

Walter Tribbey and Roger R. Meadows for Petitioner Wallace Reed Phelps.

Bill Lockyer, Attorney General, and Douglas P. Danzig, Deputy Attorney General, for Respondent the People.

## Opinion

**RICHLI, J.**—In brief, petitioner Wallace Reed Phelps seeks relief from a conviction of violating provisions of the Home Equity Sales Contract Act. (Civ. Code, § 1695 et seq.)[1] He argues that his conduct did not violate any law and that, accordingly, trial counsel rendered constitutionally defective assistance in permitting him to enter a guilty plea.[2] We agree.

The facts are not in dispute. The purported victim, Maria Rocha, owned a single-family residence located on Pleasant Court in San Bernardino. The property was in foreclosure, and in March 1998 she moved out. In early June, she was contacted by petitioner Phelps and induced to enter into an agreement and transfer of the property which, but for one factor, we will assume violated the laws under which Phelps was later charged.

The People eventually filed an information alleging that Phelps had violated certain provisions of the laws governing "Home Equity Sales Contracts" and "Mortgage Foreclosure Consultants," specifically sections 1695.6 and 2945.4, both felonies.[3] The former set of enactments provides specific requirements governing contracts between "equity purchasers" and

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

[2] This is not the first time Phelps has raised this issue. He unsuccessfully attempted to withdraw his plea on the ground raised here, and also argued the issue on appeal. In our opinion on appeal, we held that Phelps had failed to demonstrate ineffective assistance of counsel. We noted that he had several pending traffic matters and was also facing a violation of probation in Los Angeles County. Assuming arguendo that Phelps had a valid defense, the plea agreement in this case might have been designed to dispose of a number of matters; however, the record on appeal did not establish that trial counsel could have had no viable tactical reason for allowing Phelps to enter his plea. (See *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

In his habeas corpus petition, however, Phelps provides a declaration by trial counsel that indicates that as part of the plea agreement, any time imposed for violation of probation would run concurrently with the sentence here. Counsel also expresses the view that but for the conviction in this case, probation would not have been revoked. Thus, if Phelps has a good defense to the instant charges, he gained nothing by his plea.

This point is essentially now conceded by the People, who focus their argument on the position that Phelps's construction of the statute is wrong, he had no defense, and counsel was therefore correct in advising or permitting him to plead guilty.

[3] Although charged as felonies, both offenses are "wobblers" punishable either as felonies or misdemeanors. (See §§ 1695.8, 2945.7.) Phelps entered a plea only to the charge under the "Home Equity Sales Contracts" provisions. However, the quality of counsel's assistance in this regard also depends upon whether the other charge had potential viability. As the "Mortgage Foreclosure Consultants" statutes adopt the crucial definitions contained in section

the sellers of "residences in foreclosure"; the latter provisions govern the services offered by "foreclosure consultants."

The relevant statutes prohibit what are perceived to be unfair, deceptive or coercive tactics employed by those either seeking to acquire residences from distressed homeowners, or to provide paid advice to such homeowners. Section 1695, subdivision (a) explains that "homeowners whose residences are in foreclosure have been subjected to fraud, deception, and unfair dealing by home equity purchasers. The recent rapid escalation of home values, particularly in the urban areas, has resulted in a significant increase in home equities which are usually the greatest financial asset held by the homeowners of this state. During the time period between the commencement of foreclosure proceedings and the scheduled foreclosure sale date, homeowners in financial distress, especially the poor, elderly, and financially unsophisticated, are vulnerable to the importunities of equity purchasers who induce homeowners to sell their homes for a small fraction of their fair market values through the use of schemes which often involve oral and written misrepresentations, deceit, intimidation, and other unreasonable commercial practices." Subdivision (b) then provides that "[t]he Legislature declares that it is the express policy of the state to preserve and guard the precious asset of home equity, and the social as well as the economic value of homeownership."

The crucial definitions are those of "residence in foreclosure" and "residential real property in foreclosure." As set out in section 1695.1, subdivision (b), the statutes apply to "residential real property consisting of one- to four-family dwelling units, one of which the owner occupies as his or her principal place of residence." "Property owner" is defined as "the record title owner of the residential real property in foreclosure . . . ." (§ 1695.1, subd. (f).)

▮ · In this case, the parties agree that the alleged victim, Maria Rocha, had moved out of the house in question several weeks before she was approached by Phelps. The issue presented by this petition is whether this factor makes the statutory schemes inapplicable to petitioner's conduct.

## DISCUSSION

To begin with, it must be said that the result for which the People argue is by no means unreasonable. Given that the statutes reflect a concern to protect not only the occupancy element of homeownership, but also the

---

1695.1, our interpretation of the former statutes is dispositive of the charge under both sets of laws. (See § 2945.1, subds. (e) & (f).)

value of the owner's equity, it would not be illogical for the Legislature to extend protection to an owner who has vacated his or her home under the threat of foreclosure. As we explain, however, the statutes are simply not susceptible of this construction and, as written, cannot be stretched to cover the former occupant/owner without losing all limitation and focus.

As set out above, section 1695.1 defines a "residence in foreclosure" as property "which the owner *occupies* as his or her principal place of residence." (Italics added.) Whether or not this language was deliberately intended to limit the scope of the statute, there can be no dispute that the provision does employ the present tense in describing the factors that constitute a "residence in foreclosure." It is one which the owner *occupies*, not *has occupied at some point in the past*.

 It is axiomatic that " '[t]o determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent.' [Citation.] If it is clear and unambiguous our inquiry ends. There is no need for judicial construction and a court may not indulge in it. [Citation.] 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047 [80 Cal.Rptr.2d 828, 968 P.2d 539].) Thus, an initial reading of section 1695.1 leads ineluctably to the conclusion that the prohibitions of the chapter do not apply if the owner of the premises does not occupy it when a transaction otherwise governed by the statutes occurs.

The People argue that there is no rational ground to deprive persons such as Maria Rocha of the protections of the statutes simply because she had moved away from her home. In support of their position, they assert that the only situation in which the owner must currently occupy the residence is that involving a multifamily dwelling.

The language in question is the phrase "residential real property consisting of one- to four-family dwelling units, one of which the owner occupies . . . ." (§ 1695.1, subd. (b).) We agree that the Legislature did not intend to protect the nonresident landlord of a multifamily dwelling, and therefore provided that the statutes only apply to a multifamily dwelling if the owner lives in one of the units. However, if this is so, we can ascertain no reason why the Legislature would have wished to protect the nonresident landlord of a single-family residence. Under the People's construction, a nonresident landlord who rented out a single-family home—or three, or 10, single-family homes—could claim the protections of the statutes even if he or she had

never lived in any of the houses, but the nonresident owner/landlord of a duplex could not, even if the owner/landlord of the duplex had once lived in one of the units.

In these examples, neither owner, in our view, is more or less likely to be uniquely distressed, either financially or emotionally, by a foreclosure; accordingly, there is simply no good reason to distinguish between them by protecting one and not the other. The crucial element that must trigger the application of the statutes is the fact that the owner is losing his or her home, the equity in which is likely to be the owner's most substantial financial asset.

In further support of their construction, however, the People rely on the "last antecedent" rule. As explained by our Supreme Court, "[a] longstanding rule of statutory construction—the 'last antecedent rule'— provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191].) The People argue that the rule requires us to apply the phrase "one of which the owner occupies" only to the supposed last, or immediately preceding term: that which describes multifamily dwellings.[4]

 The "last antecedent rule" is, however, "not immutable." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1130 [81 Cal.Rptr.2d 471, 969 P.2d 564](conc. & dis. opn. of Baxter, J.).) It should not be rigidly applied if " ' "the natural construction of the language demands that the clause be read as applicable to all" ' " or if " 'the sense of the entire act requires that a qualifying word or phrase apply to several preceding wo[r]ds . . . .' " (*White v. County of Sacramento, supra,* 31 Cal.3d at p. 681.) It is further evidence of the intent to apply the qualifying phrase to all antecedents if it is separated from the antecedents by a comma.

 Assuming that there are multiple antecedents in section 1695.1, there is a comma so placed as to suggest that the "last antecedent rule" does not apply. Although grammatically it is somewhat awkward to apply the phrase "one of which the owner occupies" to an antecedent, which itself

---

[4]If this is in fact what the Legislature meant, it is imperfectly and awkwardly expressed. A more sensibly constructed description might read: "residential real property consisting either of a single-family home, or a two- to four-family dwelling unit, one of which the owner occupies as his or her principal residence." We also note that with this phrasing, there clearly are multiple antecedents.

contains the numerical limitation ("one- to four-family dwelling units"), it is neither redundant nor plainly inapplicable. (Cf. *White v. County of Sacramento, supra,* 31 Cal.3d 676 [the qualifying phrase "for the purposes of punishment" was properly applied only to the last antecedent, "transfer," because at least some of the other antecedents, including "reprimand" and "dismissal," were necessarily already punitive and the qualifying phrase did not apply to them].) As we have explained, we also think that the "sense of the entire act" requires applying the residence requirement in the qualifying proviso both to single-family and multifamily dwellings.

Finally, on this point, we would suggest that there is only one antecedent and the qualifying phrase therefore must attach to all of it. (Cf. *ante,* fn. 3.) When it applies, the rule is that the qualifying clause applies to the words or phrases immediately preceding. (*White v. County of Sacramento, supra,* 31 Cal.3d at p. 680.) The use of dashes to connect the words "one- to four-family dwelling units" clearly indicates that it is intended as a *single* phrase, or antecedent to the qualifying clause. Under this construction, the "last antecedent rule" has no application.

Although we might agree that it would be better to extend the act to protect homeowners who have left their homes under immediate threat of a foreclosure, the difficulty is that even if we were prepared to disregard the unequivocal present tense "occupies," there is no way to do so without eviscerating the statute.[5]

If there is no requirement that the homeowner currently occupy the residence in foreclosure, what might the Legislature have really intended? Perhaps that the protective statutes apply to an owner who had resided in the home until foreclosure proceedings began. This seems reasonable. But when do such proceedings begin? Is it when a notice of default is served on the owner? Or when a notice of sale is served? (§ 2924.) What about the owner who leaves his or her home before receiving a notice of default because he or she realizes that the payments cannot be made? What if a homeowner cures an initial default, but then decides to live elsewhere? Once the requirement for current occupation is abandoned, the statute provides no clue to the answer to these questions. Worse still, if an owner need not occupy the home when approached by the "home equity purchaser" or "foreclosure consultant," there is no statutory limitation on the length of the absence, or its cause.

---

[5]Petitioner unsuccessfully sought habeas corpus from the superior court. That court felt that the statutes were most reasonably construed to apply to a recent owner/occupant. As explained, we are compelled to disagree.

Given the express statutory purpose, however, it could not reasonably be interpreted to apply to homeowners who have occupied the home at some unspecified point in the past, however long before the foreclosure proceedings. For example, there would be no need for statutory protection for a property owner who had moved out years ago and was, perhaps, currently using the house to provide rental income. (See discussion of multiple-family homes, *post.*) Thus, if we do not recognize the restriction of the statutory operation to the situation in which the owner lives in the residence when the offense occurs, it is impossible to limit it so that it does not apply in situations clearly not contemplated by the Legislature.[6]

In summary, we conclude that the statute means what it says: that it only applies when the owner of a "residence in foreclosure" is approached while residing in the home.[7] And although, as we have noted above, it is not impossible that the Legislature did intend to protect nonresident owners, the result compelled by the statutory language is far from unreasonable. It is true that the legislative purpose was to protect both home ownership and home equity, and that an owner may have protectible equity even if it is not realistic to suppose that he or she can retain ownership. However, an owner who has moved out presumably feels less stress and pressure, and is therefore less likely to enter into a disadvantageous deal in the hope of staving off foreclosure.[8] Thus, the Legislature could rationally have chosen to extend the statutory protections only to those owners still attempting to remain in their homes.[9]

Under the facts as agreed upon in the record of this petition, petitioner did not commit a crime. Counsel rendered constitutionally deficient assistance in advising, or permitting, him to plead guilty to violating the Home Equity Sales Contracts law.

---

[6]Another example would be the homeowner who lives in a home, then purchases a second house which becomes the principal residence. Since the first home was once occupied as a principal residence, any approaches to the owner during foreclosure would be governed by the statutes if there is no requirement of present occupancy.

[7]Although we need not reach the issue, our discussion of the problems raised by interpreting the definitional statute as the People desire should make it clear that if the statute is intended to be read in that manner, it is hopelessly ambiguous. Accordingly, petitioner's arguments based on the rules that penal statutes must give clear notice of the conduct prohibited, and that they must be construed in favor of a defendant insofar as reasonably possible, have merit. (See, e.g., *People v. Franklin* (1999) 20 Cal.4th 249, 253-254 [84 Cal.Rptr.2d 241, 975 P.2d 30].)

[8]We acknowledge that even an owner who has moved out may be susceptible to schemes touted as designed to save his credit. However, this would be true of any property owner, not just a homeowner.

[9]As the general tenor of our discussion should make apparent, however, the statutes are far from clear. If in fact the Legislature intended to provide protection to additional homeowners, we urge it to consider amending or clarifying the law.

## DISPOSITION

The petition for writ of habeas corpus is granted. Petitioner shall be permitted to withdraw his plea of guilty and the matter shall proceed in the superior court.

Hollenhorst, Acting P. J., and Ward, J., concurred.